UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

IN RE MERIX CORPORATION                                No. CV 04-826-MO

SECURITIES LITIGATION                                  OPINION AND ORDER

**MOSMAN, J.,**

      Merix is a company that manufactures high-end circuit boards for customers like Cisco,

Motorola, Ericsson, Nokia, and Intel. On January 29, 2004, Merix released approximately four

million shares of common stock in a secondary public offering ("the January offering"). At the

time of the January offering, Merix was already a publicly trade company with approximately

eighteen million shares of stock outstanding. Although the shares issued in the January offering

sold for approximately twenty-five dollars per share, the stock declined to around ten dollars per

share in the following months.

      The putative class members are those who allege they purchased shares in the January

offering. They claim that Merix executives and directors ("Merix defendants") and the firms who

underwrote the shares ("Underwriter defendants") are liable for their stock losses. Plaintiffs'

theory of liability is that the prospectus filed with the January offering contained material

misrepresentations that inflated the stock value for the January offering and then caused the stock

to lose value when the market became aware of the misrepresentations. The plaintiffs have

alleged three claims: (1) Violation of § 11 of the Securities Act, 15 U.S.C § 77k; (2) Violation of § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2);[1] and (3) Violation of § 15 of the Securities Act, 15 U.S.C. § 77o.[2]

This matter comes before the court on Lead Plaintiff's Motion for Class Certification (#160). In its motion, plaintiff Central Laborers' Pension Fund ("Central Laborers") moves (1) to certify a class action on behalf of "all persons and entities who purchased or otherwise acquired the common stock of Merix Corporation . . . pursuant and/or traceable to Merix's January 29, 2004 offering and who were damaged thereby"; (2) to be appointed as class representative; and (3) to appoint the firm of Barroway Topaz Kessler Meltzer & Check, LLP ("Barroway") as lead counsel for the class. The Merix defendants filed the primary opposition to the motion (#167). The Underwriter defendants joined the Merix defendants' opposition and filed their own opposition that raises arguments unique to the § 12(a)(2) claims (#163).

## BACKGROUND

A hearing was held in this case on October 13, 2009. After two hours of oral argument, and for the reasons stated on the record, the Court ruled as follows:

(1)    Central Laborers has standing with respect to its § 11 claim;

(2)    The putative class satisfies the numerosity and commonality requirements of Federal Rule of Civil Procedure 23(a); and

(3)    Central Laborers is not subject to unique defenses such that it would be considered an atypical class representative under Rule 23(a).

---

[1]  The § 12(a)(2) claim is asserted against only the underwriter defendants.

[2]  § 15 of the Securities Act creates a cause of action against anyone who "controls" a person who is liable under §§ 11 or 12(a)(2). Because § 15 liability is predicated on §§ 11 or 12(a)(2) liability, § 15 does not figure prominently in this discussion.

The Court left the following issues to be resolved through this opinion and order:

(1)    Whether Central Laborers fulfills the adequacy and typicality requirements of Rule 23(a) in light of conflict of interest concerns raised by the defendants;

(2)    Whether issues of traceability would contravene the Rule 23(b)(3) requirement that common questions of law or fact predominate over individual questions;

(3)    Whether Central Laborers can represent plaintiffs that assert § 12(a)(2) claims against certain Underwriter defendants when Central Laborers itself does not have standing to sue those defendants; and

(4)    Whether a potential defense of loss causation would preclude certification of the class.

## DISCUSSION

### I.    Adequacy and Typicality

Defendants claim that Central Laborers fails the Rule 23(a) standard for adequacy and typicality because Central Laborers' relationship with their legal counsel raises a conflict of interest, or at least the appearance of a conflict. The primary basis for their argument is a contingency fee agreement between Central Laborers' general counsel, the law firm of Cavanagh & O'Hara, and putative class counsel, Barroway. After oral argument, Central Laborers filed notice that Cavanagh & O'Hara would no longer be working on this case and will not receive any fees from its prior work on this case. In light of these developments, defendants' conflict of interest concerns are moot. I find that Central Laborers has met its burden to show it will fairly and adequately protect the interests of the class. I also find, with respect to its § 11 claims only, that Central Laborers raises claims and defenses that are typical of those raised by the class.

### II.    Predominance and Superiority

Having found that Central Laborers meets the predicate requirements of Rule 23(a), at

least with respect to its § 11 claims, I now consider whether the putative class action meets the requirements of Rule 23(b)(3).[3] Rule 23(b)(3) requires plaintiffs to show that a class action is superior to other methods of adjudicating their claims and that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members."

The elements of a § 11 claim are divided into individual and common questions as follows. The members of the class will present the same evidence on the core issues of liability: whether the January prospectus contained material omissions or misrepresentations and whether the shares lost value because the market became aware of those defects. The individual questions are whether a plaintiff purchased its shares in the January offering ("traceability") and whether a plaintiff's shares lost value.

I conclude that individual questions of traceability will overwhelm the core common questions of liability if the class is certified to include plaintiffs who purchased Merix shares in the aftermarket after the date of the January offering. I therefore limit the class to plaintiffs, like Central Laborers, that purchased their shares from an underwriter on the date of the January offering. With the class limited to these plaintiffs, I find that common questions predominate over individual questions and that a class action is a superior method of adjudicating the issues in this case.

### A.    *Predominance*

To state a claim under § 11 of the Securities Act, a plaintiff must allege not only that a registration statement contained a material omission or misrepresentation, but also that the plaintiff purchased stock in the offering related to the defective statement. *Hertzberg v. Dignity*

---

[3] Plaintiffs have not alleged that this action meets the requirements of Rule 23(b)(1) or (b)(2).

*Partners, Inc.*, 191 F.3d 1076, 1080 (9th Cir. 1999). This burden can be met by showing (1) plaintiff purchased shares directly in the public offering; or (2) plaintiff purchased shares that are directly traceable to the public offering.

Because the plaintiffs in this case challenge statements made in the prospectus for the January offering, each plaintiff must either show it purchased stock in the January offering or trace its later-purchased stock back to the January offering. The issue of traceability is complicated by the fact that Merix already had millions of shares outstanding prior to the January offering. One court that confronted a similar problem of traceability concluded that individual questions of standing would overwhelm common questions if the class were defined to include those plaintiffs who purchased in the aftermarket.[4] *Tsirekidze v. Syntax-Brillian Corp.*, No. CV-07-2204-PHX-FJM, 2009 WL 2151838, at *7 (D. Ariz. July 17, 2009). The court chose to address the problem by limiting the class to those plaintiffs who purchased directly from underwriters on the date of the secondary offering. *Id.*

Here, as in *Tsirekidze*, some individual traceability questions will be less complicated than others. If this case proceeds to trial, direct purchasers who can show they purchased Merix stock from an underwriter on the date of the January offering will require less time and evidence to prove standing than will a plaintiff who purchased Merix stock in the aftermarket. To ensure that questions of traceability do not overwhelm the common questions in this case, I limit the class to those plaintiffs who purchased directly from underwriters on January 29, 2004, the date of the secondary offering.

**B.    *Superiority***

---

[4] The court defined the aftermarket to include both shares purchased after the offering date and shares purchased on the offering date but from a source other than an underwriter.

Having limited the class in a way that will allow common questions to predominate over individual questions, I now find that a class action is a superior method of adjudicating plaintiffs' claims. As discussed above, this case will turn on common questions of whether the January prospectus contained material misrepresentations or omissions and whether the alleged misrepresentations and omissions caused plaintiffs' shares to lose value. It is more efficient to resolve these questions in a single class action than to continually relitigate the same issues and facts in a series of individual proceedings. Finally, both Central Laborers and the Barroway law firm have experience with securities fraud and class action litigation that will ensure each member of the class receives fair and adequate representation.

I therefore certify a class of plaintiffs who purchased or otherwise acquired the common stock of Merix Corporation from an Underwriter defendant directly pursuant to Merix's January 29, 2004 offering. I appoint Central Laborers as class representative and the Barroway law firm as class counsel. For the reasons discussed below, I limit the class to plaintiffs who held their stock through May 13, 2004 and who raise § 11 claims or § 15 claims predicated on § 11 violations.

## III.   Certification of § 12(a)(2) Claims

Although Central Laborers has standing with respect to its § 11 claim, its standing with respect to the § 12(a)(2) claim requires a different analysis. A critical difference between a § 11 claim and a § 12(a)(2) claim is that a § 11 claim can be brought by a person who purchased a security in the "aftermarket" – sales occurring after the initial offering. In contrast, a § 12(a)(2) claim requires privity between the purchaser and the party that underwrote the security. *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1096, 1081 (9th Cir. 1999). Central Laborers presented evidence that it purchased securities from one of the six Underwriter defendants, UBS,

and therefore has standing with respect to its § 12(a)(2) claim against UBS. Central Laborers has

not, however, presented evidence that it purchased securities from the other Underwriter

defendants.

At oral argument, the Underwriter defendants argued that a class could not be certified for

§ 12(a)(2) claims because Central Laborers lacks Article III standing to sue five of the six

Underwriter defendants.[5] Central Laborers asserted that it could act as class representative,

despite its lack of standing, because Central Laborers' claims and defenses are typical of the

claims and defenses of the absent class members who did have standing.

Article III standing and Rule 23(a) typicality are related but distinct concepts. Although

the question of Central Laborers' standing has been raised in the context of class certification, the

Article III standing analysis must remain separate from the adequacy and typicality analysis

under Rule 23(a). *See Lindquist v. Farmers Ins.*, No. CV 06-597-TUC-FRZ, 2008 WL 343299, at

*8 (D. Ariz. Feb. 6, 2008) ("Care must be taken . . . to analyze individual standing requirements

separately and apart from Rule 23 class prerequisites. Though the concepts appear related . . .

they are in fact independent criteria."). Because Central Laborers lacks standing to sue five

Underwriter defendants, I hold that it also lacks standing to act as class representative for a class

of plaintiffs raising § 12(a)(2) claims against those five Underwriter defendants. I therefore

decline to certify a class with respect to the § 12(a)(2) claims.

A.    ***Standing Analysis***

---

[5]    Article III standing requires an injury in fact, fairly traceable to the defendant, that can
be redressed through the requested relief. *Steel Co. v. Citizens for a Better Environment*, 523
U.S. 83, 102-03 (1998). In this context, Central Laborers lacks standing to sue Underwriter
defendants with which it is not in privity because its § 12(a)(2) injuries are not fairly traceable to
those defendants.

This issue is not whether Central Laborers can somehow acquire standing to assert a §

12(a)(2) claim against the Underwriter defendants with which it is not in privity; it clearly

cannot. Instead, the critical question is whether Central Laborers can, even without standing,

represent a class of unnamed plaintiffs who are alleged to be in privity with the other Underwriter

defendants.

I conclude that Article III does not permit suit where the only named plaintiff lacks

standing to sue several of the defendants. *See e.g.*, *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)

("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a

case or controversy with the defendants, none may seek relief on behalf of himself or any other

member of the class."); *Easter v. American Financial*, 381 F.3d 948, 962 (9th Cir. 2004);

*Lindquist*, 2008 WL 343299, at *9; *Henry v. Circus Circus Casinos*, 223 F.R.D. 541, 543 (D.

Nev. 2004). This is not to say that a named plaintiff must have standing to sue each and every

defendant. At a minimum, Article III requires a collection of named plaintiffs who, together,

have standing to sue every defendant. *See Henry*, 223 F.R.D. at 543. But even that "collective

standing" of a group of named plaintiffs is missing here.

The importance of having a collection of named plaintiffs with standing can be illustrated

by the facts of this case. Central Laborers merely speculates that unnamed absent members of the

class have standing to sue the Underwriter defendants. At this time, it is unclear whether Article

III standing will ever be satisfied as to all Underwriter defendants. If a class was certified to

include § 12(a)(2) claims and Central Laborers alone was appointed class representative, this

case could proceed through trial and to a claims phase before it became clear that standing was

satisfied for all, some, or none of the other five Underwriter defendants. An Underwriter

defendant could conceivably defend an entire case before learning that the action was improperly

before the court. Article III does not allow standing to be determined at such a late stage, even in

the context of a class action. A collection of named plaintiffs with standing ensures, from the

very beginning of the case, that there is a live case or controversy between the parties.

      **B.**     ***The Relationship Between Standing and Typicality***

      Once a court has concluded that a collection of named plaintiffs satisfies the test for

Article III standing, the court may consider the typicality requirement under Rule 23(a).

Typicality is generally absent if a class representative asserts a class action claim against a

defendant that the representative could not sue individually. *La Mar v. H & B Novelty & Loan

Co.*, 489 F.2d 461, 465-66) (9th Cir. 1973). *La Mar* contains an exception, however, for cases in

which "all injuries are the result of a conspiracy or concerted schemes between the defendants" or

"instances in which all defendants are juridically related in a manner that suggests a single

resolution of the dispute would be expeditious." *Id.* at 466. In § 12(a)(2) securities cases, some

courts have found a juridical link between underwriters that fulfilled the typicality requirement

and permitted class certification. *See In re Computer Memories Sec. Litig.,* 111 F.R.D. 675, 680

(N.D. Cal. 1986); *In re Activision Sec. Litig.*, 621 F. Supp. 415, 432 (N.D. Cal. 1985); *In re Itel

Securities Litigation*, 89 F.R.D. 104, 118-22 (N.D. Cal. 1981) (certifying a defendant class).

      A juridical relationship does not confer standing, but allows lead plaintiffs to fulfill the

typicality requirement and represent members of the class who do have standing. This typicality

analysis rests on an assumption, however, that at least one named plaintiff has standing as to each

defendant. *See In re Activision Sec. Litig.*, 621 F. Supp. at 426 (considering whether any of the

named plaintiffs could assert a § 12(a)(2) claim against a defendant underwriter before moving to

a discussion of class certification). For example, the *La Mer* juridical relationship exception may

apply to a putative class action in which all named plaintiffs, collectively, have Article III

standing to sue all defendants but no single named plaintiff has standing to sue all defendants. But a juridical relationship cannot substitute for Article III standing where none exists.

### C.    *The § 12(a)(2) Class Lacks an Adequate Representative, or Collection of Representatives*

I find that Central Laborers lacks Article III standing to represent a class of plaintiffs who raise § 12(a)(2) claims against the Underwriter defendants with which Central Laborers is not in privity. Because Central Laborers is not eligible to represent a § 12(a)(2) class, and plaintiffs have proposed no eligible representative or collection of representatives who could fairly and adequately protect the interests of such a class, I deny class certification with respect to the § 12(a)(2) claims.[6]  I limit the class to those plaintiffs raising § 11 claims, as well as § 15 claims predicated on § 11 violations.

## IV.    **Loss Causation**

Defendants also challenge class certification on the grounds that plaintiffs will be unable to rebut a defense of loss causation. At this early stage in the proceedings, I find that the allegations in plaintiffs' consolidated amended complaint (#86) are sufficient to survive what is essentially a Rule 12(b)(6) motion to dismiss for failure to state a claim. I also find, however, that the defense of loss causation is relevant to defining the shape of the class. On the face of the amended complaint, plaintiffs who sold their shares before May 13, 2004, the date of the first alleged corrective disclosure, will be unable to rebut a defense loss causation. I therefore limit the class to those plaintiffs who held their Merix shares until May 13, 2004.

A plaintiff is not required to plead loss causation as an element of his § 11 claim. Rather,

---

[6]  Although Central Laborers theoretically could represent a class of plaintiffs who raise § 12(a)(2) claims against UBS only, it has not presented evidence that such a class would meet the Rule 23(a) numerosity requirement.

the absence of loss causation is an affirmative defense to liability for which defendants bear the

burden of proof.[7] *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1421-22 (9th Cir. 1994).

Although loss causation may be considered at the class certification stage, it does not fall neatly

within the Rule 23 analysis. Rather, it is more appropriately characterized as a Rule 12(b)(6)

motion to dismiss. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1171

(C.D. Cal. 2008).

A loss causation defense prevents a defendant from being held liable for omissions or

misrepresentations contained in a registration statement if the decline in stock value is not related

those omissions or misrepresentations. *In re Worlds of Wonder Sec. Litig.*, 35 F.3d at 1422.

When a company's misleading registration statement artificially inflates its stock value in an

efficient market, one expects the most dramatic losses in stock value to occur when a company

issues a "corrective disclosure," a statement that corrects the omissions or misrepresentations.

*See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d at 1171.

In those cases where courts have granted a Rule 12(b)(6) motion on the issue of loss

causation, the loss causation problem has been evident on the face of the complaint. *See id.* at

1171-74. The face of a complaint can provide a complete loss causation defense where the vast

majority of lost stock value cannot be attributed to the alleged corrective disclosure. A loss

causation problem occurs primarily where the security experienced a dramatic loss of value

<u>before</u> a disclosure corrected the false or misleading registration statement. *Id.* at 1171. For

example, it was appropriate to grant a motion to dismiss where stock dropped 74% several

---

[7] Loss causation under section 11 has been described as the mirror image of loss causation under section 10(b). Whereas loss causation is an affirmative defense under section 11, the plaintiff bears the burden of proving loss causation under section 10(b).

months prior to an alleged corrective disclosure. *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003).

Here, the allegations in plaintiffs' complaint are sufficient to survive a motion to dismiss. The complaint alleges that Merix's primary corrective disclosure occurred on May 13, 2004, and that the Merix stock price fell 30% immediately after the disclosure (Second Amended Complaint (#85) ¶ 12). Plaintiffs also allege that a second corrective disclosure on June 30, 2004 caused the stock value to drop an additional 14.4% (*Id.* ¶13). Considering that loss causation is an affirmative defense to § 11 liability rather than an element of plaintiffs' claims, arguments that look beyond the pleadings will be considered at the summary judgment stage after plaintiffs have had an opportunity to take discovery on this issue. *See In re Countrywide Financial Corp. Sec. Litig.*, 588 F. Supp. at 1171 ("Because an analysis of causation is often fact-intensive, negative causation is generally established by a defendant on a motion for summary judgment or at trial.").[8]

The face of the complaint does raise loss causation questions relevant to defining the shape of the class, however. Plaintiffs allege that the market first became aware of Merix's misrepresentations in May 13, 2004. Plaintiffs who sold their shares before May 13, 2004 will be unable to attribute their stock losses to the alleged corrective disclosure. I therefore restrict the class to those plaintiffs who held Merix stock through the first alleged corrective disclosure on May 13, 2004.

---

[8] At oral argument, defendants proposed a restrictive view of loss causation that requires the corrective disclosure to expressly disavow the alleged misrepresentations or omissions. But, according to defendants, proving that theory includes presenting evidence of how the market interpreted and responded to the alleged corrective disclosure. The market's collective response to Merix's disclosures is a fact-intensive inquiry that underscores the importance of deferring the loss causation issue until the summary judgment stage.

## CONCLUSION

For the foregoing reasons, I GRANT IN PART AND DENY IN PART Lead Plaintiff's Motion to Certify the Class (#160). I certify a class composed of all persons and entities who purchased or otherwise acquired the common stock of Merix Corporation from an Underwriter defendant directly pursuant to Merix's January 29, 2004 offering, who held the stock through the first alleged corrective disclosure on May 13, 2004, and who were damaged thereby. I appoint Central Laborers as class representative and appoint Barroway Topaz as class counsel. Finally, I allow class treatment only with respect to § 11 claims and § 15 claims predicated on § 11 violations.

IT IS SO ORDERED.

DATED this _5th_ day of November, 2009.


/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Court